## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                          No.  CR-06-0762 MV

ALFONZO JUAREZ and
JORGE ALFONSO PERAZA,

      Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Juarez's Motion to Suppress **[Doc. No. 48]**, filed July 25, 2006.[1]  The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that the **Defendant Juarez's motion is well taken and will be GRANTED**.

### BACKGROUND

Defendant Juarez was the subject of a drug trafficking investigation that took place in March, 2006.  The investigation first began to close in on Defendant Juarez on March 2, 2006, when a Confidential Informant ("CI") notified law enforcement that she had bought methamphetamine from individuals referred to as "Miguel" and "Flaco."   Agents began to use the CI to conduct controlled purchases in order to garner evidence about the drug trafficking in which "Miguel" and "Flaco" were believed to be engaging.  The investigation lasted the course of about a week.  During that week, Defendant Juarez came under close surveillance.  At one poin**t, on March 8, 2006,** the vehicle that

---

[1]At the suppression hearing, Defendant Peraza asserted that he joined Defendant Juarez's motion.  However, there is nothing in the pleadings to indicate that he had, in fact, joined Defendant Juarez's motion.

he was traveling in was pulled over in a traffic stop.  The alleged reason for this traffic stop had to do with **the temporary tag on the vehicle but the police used the stop as an opportunity to gain information about Defendant Juarez that they previously had been unable to obtain**.  Ultimately, the police's drug trafficking investigation culminated in the arrest of Defendant Juarez on March 10, 2006.  His arrest was pursuant to an arrest warrant and a search warrant was also executed in connection with his arrest.

## DISCUSSION

**Defendant Juarez argues that the evidence seized as a result of the traffic stop on** March 8, **2006, should be suppressed because there was no reasonable suspicion for the original stop or, if there was reasonable suspicion for the stop, the continued detention was invalid**.

## I.     Legality of Traffic Stop on March 8, 2006

### A.     Standing

As a preliminary matter, the government seems to argue that Defendant Juarez does not have standing to ask this Court to suppress evidence resulting from the traffic stop.

While challenging a search may require some personal expectation of privacy, such an expectation of privacy is not required when challenging a detention.  *See United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000) (quotation omitted);  *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001).  Specifically, with regards to traffic stops, Tenth Circuit law is clear that "although a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found . . . as the fruit of the defendant's illegal detention."  *DeLuca*, 269 F.3d at 1132.  Under this standard, Defendant Juarez clearly has standing to challenge his

detention during the traffic stop and to seek suppression of any evidence that is the fruit of that traffic stop.

**B.**   **Legality of Stop**

To determine whether a traffic stop comports with the requirements of the Fourth Amendment, a two-prong test is used. *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) (citations omitted). First, the stop must be justified at its inception, and second, the detention must be reasonably related in scope to the circumstances of the stop. *Id.*

(1)   Justification at Inception of Stop

The first prong of this test is articulated as follows:

[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring. It is irrelevant, for purposes of Fourth Amendment review, "whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop." It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle. Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated "any one of the multitude of applicable traffic and equipment regulations" of the jurisdiction.

*Id.* at 787.

Defendant Juarez argues that the traffic stop of the vehicle he was traveling in on August 8, 2006, was unconstitutional because the police had no reasonable articulable suspicion that a traffic or equipment violation had occurred or was occurring**.**

The search warrant affidavit prepared by Agent Jamison, sets forth the following description of the traffic stop at issue:

On 3/8/2006 at approximately 0005 hrs, I contacted Deputy Aeschlemann and had him meet me at the Region II office. I then rode with him in his marked police car to

the Harvest Gold area to try and find out where Alfonzo [Juarez] was staying.  We checked the whole area, but were unable to find the brown colored Chevy Suburban that Alfonzo drove.  At approximately 0035 hrs, Lt. Christensen called me and advised that he saw two Hispanic males getting into a brown Chevy Suburban matching the description of Alfonzo's vehicle.  I advised him that the Deputy and I would stay in the area to try and find out where Alfonzo was going.  Lt. Christesen followed the vehicle eastbound on U.S. 64 until it turned off into E. Blanco Blvd towards the Harvest Gold subdivision.  **The Deputy and I got in behind the vehicle North bound on CR4903 when we noticed that we were unable to tell if the temp tag was valid.**  Deputy Aeschlemann engaged his emergency equipment and stopped the vehicle near the intersection of CR4903 and CR4906.  Deputy Aeschlemann advised the driver of the vehicle why he stopped him and asked for his drivers license, registration, and proof of insurance.  The driver advised that he did not have any identification on him.  The male tried to give Deputy Aeschlemann a debit card from the Bank of America as identification.  Deputy Aeschlemann asked the male if he would mind if checked his wallet for an ID, and he readily handed it to Deputy Aeschlemann.  Deputy Aeschlemann advised me that the wallet had very little in it other than cash, about half a dozen motel key cards, and an Arizona driver's license. the male was identified as Alfonzo, Seferino, Pena, Juarez by the Arizona drivers license found in his wallet.  Alfonzo advised Deputy Aeschlemann that he did not have any insurance on the vehicle.  After writing out a traffic citation Deputy Aeschlemann had Alfonzo exit the vehicle so that he could explain the citation to him.  I was able to zoom in on the subject using the in car camera in Deputy Aeschlemann's police vehicle.  Deputy Aeschlemann asked the driver for a local address and was given directions to #15 CR4909.  After issuing the citation Alfonzo was released.

Jamison Aff. pg. 5 (emphasis added).

At the suppression hearing, Deputy Aeschlemann testified that the vehicle was pulled over because he could not see the expiration date on the temporary tag.  He explained that he could not see the expiration date because the lights from his police vehicle were creating a glare on the clear plastic that protected the temporary tag.

Whether a stop was justified at its inception, where an officer pulled over a vehicle because of a questionable temporary tag, was addressed by the Tenth Circuit in *United States v. Edgerton*, 438 F.3d 1043 (10th Cir. 2006).  In *Edgerton* a police officer pulled over a vehicle when he became

suspicious about a temporary tag.  The officer, "[i]nstead of pulling over the defendant solely to check the validity of what he knew to be a temporary tag posted in the rear window, . . . initiated the stop because he was not even able to determine whether the defendant's car had a temporary tag." *Id*. at 1047-48.  The Tenth Circuit found that, in those circumstances, the stop was justified at its inception.  Specifically, the Tenth Circuit stated that "Because the vehicle's assigned registration in this case was not readily apparent to [the officer], his suspicion that Defendant was violating Kansas law pertaining to the display of license plates . . . was objectively reasonable."  *Id*. at 1047.  Although the Tenth Circuit does not specifically say so, it seems that if the officer had only pulled over the vehicle to check the validity of a tag that was properly displayed, the Tenth Circuit may have reached a different result.

As a basis of comparison, the *Edgerton* court cited *United States v. Wilson*, 205 F.3d 720, 722-724 (4th Cir.2000) (en banc).  The *Wilson* court held that an officer's inability to read a temporary tag's handwritten expiration date due to darkness did not justify the stop.  The Fourth Circuit found that:

> There was nothing illegal about the operation of the vehicle, and nothing appeared illegal about the temporary tag.  It was dark, and both cars were moving.  Although Officer McLemore "could not see the written-in expiration date on the tag," that appears to have been a function of the darkness and the small space provided for writing in the date.  There is no evidence that the temporary tag was illegible or in any way obliterated, smudged, or faded.  There is no evidence that the tag lacked any required information, that it was improperly displayed, or that it was concealed in any way.  Wilson was pulled over solely because Officer McLemore could not read the handwritten expiration date "in the bottom little corner of the paper tag" as he drove behind Wilson after darkness had fallen.  An objective assessment of the facts and circumstances of this stop compels the conclusion that the officer lacked any articulable, reasonable suspicion that a violation had occurred.  Simply put, he saw nothing wrong, and he suspected nothing.  Upholding a stop on these facts would permit the police to make a random, suspicionless stop of any car with a temporary tag.

*Wilson*, 205 F.3d at 723.

Likewise in this case, there is no evidence that the tag lacked any required information, that it was improperly displayed, or that it was concealed in any way. Defendant Juarez was pulled over solely because the officers could not read the handwritten expiration date on the paper tag as they drove behind Defendant Juarez after dark. The reason they could not see the tag was because the lights of the police vehicle cast a glare on the protective cover of Defendant Juarez's temporary tag.

Instead of showing that there was a justifiable reason to stop Defendant Juarez's vehicle, the evidence that is before this Court indicates that the temporary tag was simply a pretext for getting information about Defendant Juarez. On the night of the traffic stop, Agent Jamison and Deputy Aeschlemann were actively trying to find out information about Defendant Juarez; specifically, Agent Jamison wanted to know where Defendant Juarez was staying. When they received a call that Defendant Juarez had been spotted, Agent Jamison and Deputy Aeschlemann tracked down Defendant Juarez's vehicle and began to follow it. After following the vehicle for a period of time, they decided to stop Defendant Juarez's vehicle. Deputy Aeschlemann testified that the reason for the stop was because he could not clearly read the temporary tag.[2] No citation was ever issued based on the temporary tag. In fact, when Agent Jamison and Deputy Aeschlemann discussed what reason they could use to get Defendant Juarez out of the vehicle to get his photograph, they decided to cite him for lack of insurance documents. By the end of the traffic stop, Deputy Aeschlemann and Agent

---

[2]This vehicle and its temporary tag had been observed and followed by fellow officers the day before the traffic stop at issue. The fact that those officers did not conduct a traffic stop suggest strongly that they did not see anything wrong with the temporary tag that would have justified a traffic stop.

Jamison got what they were looking for, which was an address from Defendant Juarez and his photograph.

Under these circumstances, I find that the police did not have a reasonable articulable suspicion that a traffic violation was occurring; therefore, the traffic stop was not justified at its inception and was based on a mere pretext.

(2)   <u>Reasonably Related in Scope to the Circumstances of Stop</u>

Even if I had found that the stop was justified at its inception, I would still find that the traffic stop was not legal because it was not reasonably related in scope to the circumstances of the initial stop.

The Tenth Circuit has addressed the precise issue of what is reasonably related in scope where a traffic stop is conducted to check out a temporary tag.  In *United States v. McSwain*, 29 F.3d 558 (10th Cir. 1994), the Tenth Circuit addressed the legitimacy of a traffic stop based on an officer's suspicion that a temporary registration tag was invalid.   In *McSwain*, once the car was stopped and the officer approached the vehicle he was able to determine that the tag was, in fact, valid.  The issue in *McSwain* was whether the stop was reasonably related in scope to the circumstances that first justified the stop.[3]  The Tenth Circuit held that it was not reasonably related in scope, and explained that, at most, "As a matter of courtesy, the officer could explain to drivers in Mr. McSwain's circumstances the reason for the initial detention and then allow them to continue on their way without asking them to produce their driver's license and registration."  *Id*. at 561.  Because the officer went further and asked for the driver's license and registration, the Tenth Circuit held that "the

---

[3]The first prong regarding the reasonableness of the stop was not at issue in *McSwain* because the defendant conceded the propriety of the initial stop.

continued detention was illegal because the officer's reasonable suspicion regarding the validity of the defendant's temporary registration sticker was completely dispelled prior to the time he questioned the defendant and requested the documentation." *Id.*

Likewise in *Edgerton*, the Tenth Circuit addressed a stop based on questions about a vehicle's temporary tag. As previously discussed, in *Edgerton*, the officer pulled over a vehicle because he could not tell if the vehicle even had a temporary tag. The Tenth Circuit held that the initial stop was justified on this basis. However, just like the *McSwain* case, the Tenth Circuit found that once the officer approached the vehicle and could see that the temporary tag was valid, "as a matter of courtesy, [the officer] should have explained to Defendant the reason for the initial stop and then allowed her to continue on her way without requiring her to produce her license and registration." *Edgerton*, 438 F.3d at 1051.

In this case, Deputy Aeschlemann testified that the reason Defendant Juarez's vehicle was stopped was because he could not tell if the tag was valid because he could not read its expiration date due to the glare from his police vehicle's headlights. Under *McSwain* and *Edgerton*, once the vehicle was stopped, Deputy Aeschlemann should have first determined whether there was, in fact, a problem with the temporary tag. However, Deputy Aeschlemann made no attempt to verify the legality of the temporary tag before engaging in a full blown investigatory stop. In fact, a full fifteen minutes passed between the time when Defendant Juarez's vehicle was pulled over and when Deputy Aeschlemann finally examined the temporary tag. During that fifteen minutes, Deputy Aeschlemann had asked Defendant Juarez for his driver's license and "papers"; obtained Defendant Juarez's driver's license after searching Defendant Juarez's wallet ; returned to the police vehicle and ran Defendant Juarez's driver's license, decided, along with Agent Jamison, that a citation would be

issued by asking for Defendant's insurance and then issuing a citation based on lack of insurance

documents; and returned to Defendant Juarez's car, asked for Defendant Juarez's insurance and

determined that Defendant Juarez was not carrying insurance. Only after all of these events occurred

did Deputy Aeschlemann finally take a moment to look at the temporary tag on the vehicle and write

down the its numbers.[4]   Even if there had been reason to believe that the temporary tag was invalid,

as opposed to just being unclear in the glare of the headlights, under *McSwain* and *Edgerton*, the

correct thing for Deputy Aeschlemann to have done in this situation was to immediately determine

whether the temporary tag was legal.  Once it was determined that the tag was legal, he should have

explained to Defendant Juarez the reason for the initial stop and then allowed him to continue on his

way.  Instead, Deputy Aeschlemann engaged in a full investigatory stop that was not reasonably

related in scope to the circumstances of the initial stop.[5]

---

[4]**Deputy Aeschlemann testif**ied that validity of Colorado temporary registrations cannot be
checked during a traffic stop because they not documented in the computer by the Motor Vehicle
Department.  Therefore, obtaining the temporary tag number added no information that was relevant
to the stated purpose of the stop.

[5]**This Court is also disturbed by the method used to expand the scope of the stop so that
Defendant Juarez's photograph could be obtained.  The stop occurred in the middle of the night on
a road with no lights.  Despite the dangers of being outside on a road at that time of day, Deputy
Aeschlemann made Defendant get out of his vehicle for the purported purpose of explaining the
citation to him.  In fact, the video tape of the stop shows that the officers came up with the idea of
issuing a citation in** order to get Defend**ant Juarez out of the vehicle specifically so that his picture
could be taken.  When asked at the suppression hearing whether he normally asked individuals to exit
their vehicle during a traffic stop, Deputy Aeschlemann responded that he had done so before as an
officer safety issue.  Yet, he also testified that there was no concern for officer safety during this
particular stop.  It is apparent that the only reason for expanding the scope of the stop by having
Defendant Juarez exit the vehicle at approximately 1:00 a.m., on a dark road, was for the purpose of
obtaining his photograph.  It was not for any legitimate purpose related to the initial stop or for any
safety concerns**.  While this Court recognizes that the United States Supreme Court has established
a per se rule that "once a motor vehicle has been lawfully detained for a traffic violation, the police
officers may order the driver to get out of the vehicle without violating the Fourth Amendment's
proscription of unreasonable seizures" (*Maryland v. Wilson*, 519 U.S. 408, 412 (1997) (quotations

Because I find that the traffic stop was in violation of the Fourth Amendment, the issue remains, what evidence from the stop, if any, should be suppressed. "To suppress evidence as the fruit of his unlawful detention, [Defendant] must make two showings: (1) that the detention did violate his Fourth Amendment rights; and (2) that there is a factual nexus between the illegality and the challenged evidence." *DeLuca*, 269 F.3d at 1132. As previously discussed, the traffic stop in question did violate Defendant Juarez's Fourth Amendment rights. As for the second required showing, in order to establish a factual nexus Defendant Juarez must "at a minimum, . . . adduce evidence . . . showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."[6] *Id*.

Once Defendant makes this showing, the burden shifts to the government to prove that the evidence that Defendant seeks to suppress is not "fruit of the poisonous tree." The government can meet this burden "either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." *Id*.

Defendant Juarez requests that the following evidence be suppressed: photographs taken of him during the stop; identification of him based on those photographs; statements or evidence linking

---

omitted)), this Court questions whether this was reasonable under the circumstances of this particular case.

[6]This "but for" question is a more general question than that later reached when determining whether evidence is "fruit of the poisonous tree." Specifically, "Beyond the 'but for' test, the ultimate 'fruit of the poisonous tree' inquiry asks whether the challenged evidence has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 n.1 (10th Cir. 2000). In other words, even if Defendant meets his initial burden and shows that the evidence would not have come to light but for the illegal conduct, it still may not be considered fruit of the poisonous tree if it has been purged of the primary taint.

him to #15 or #14 CR4909; any in-court identifications made of him by Agent Jamison and the CI; and, any evidence gained as a result of the search of the persons, vehicles and premises at #14 CR4909.  I now analyze each category of evidence to determine whether it should be suppressed.

(a)     **Photographs taken of Defendant Juarez during the stop**

Deputy Aeschlemann and Agent Jamison decided that a citation would be issued specifically for the purpose of obtaining Defendant Juarez's photograph.  The Jamison affidavit states that "After writing out a traffic citation Deputy Aeschlemann had [Defendant Juarez] exit the vehicle so that he could explain the citation to him.  I was able to zoom in on the subject using the in car camera in Deputy Aeschlemann's police vehicle." Jamison Aff. pg. 5.  Clearly, but for the illegal detention, this photograph would not have been taken, thus the necessary nexus between the traffic stop and the photograph has been established.  Likewise, any identification based on these photographs would have a nexus to the illegal stop.

Since Defendant Juarez has met his burden of establishing a factual nexus between the traffic stop and the evidence he seeks to have suppressed, I now examine whether the government has met its burden of proving that said evidence is not "fruit of the poisonous tree."  Clearly, the government cannot claim that any photographs taken during the traffic stop were obtained by independent means.  Neither can they claim attenuation since the photographs were taken while the illegal stop was still in progress.  That leaves the claim of inevitable discovery.  "Under the inevitable discovery exception, unlawfully seized evidence is admissible if there is no doubt that the police would have lawfully discovered the evidence later." *United States v. Romero*, 692 F.2d 699, 704 (10th Cir. 1982). Specifically, this means "whether that very item of evidence would inevitably have been discovered, not merely whether evidence roughly comparable would have been so discovered."  W. LaFave,

Search and Seizure § 11.4(a), p. 268 (4th ed. 2004).  Certainly, but for the illegal traffic stop, the particular photograph at issue would never have been discovered.

For the reasons stated above I find that it is proper to suppress the photograph taken during the traffic stop.  Moreover, as a matter of policy it makes sense to suppress such evidence.  As Judge Kimball in *United States v. Beckwith*, 22 F.Supp. 2d 1270 (D. Ut. 1998) succinctly articulated :

> If the courts were to sanction the practice of making illegal arrests for the specific purpose of collecting photographs to be used in future or ongoing investigations we would encourage an increase, perhaps dramatic, in the frequency of unconstitutional conduct on the part of law enforcement. In those instances, the taking of the photographs supplies an important motive, perhaps the prime motive, for the illegal arrests. Accordingly, to protect constitutional rights, the underlying purpose of the exclusionary rule would dictate the courts bar the photographs and resulting identifications.

*Id.* at 1294 (citing W. LaFave, Search and Seizure § 11.4(g), p. 322 (3d ed. 1996)).

### (b)    Statements or Evidence Linking Defendant Juarez to #15 CR4909 and #14 CR4909.

The factual nexus is also clear regarding Defendant Juarez's link to #15 CR4909.  Again, the Jamison affidavit establishes the required nexus.  Specifically, the affidavit states that "Deputy Aeschlemann asked the driver for a local address and was given directions to #15 CR4909." Jamison Aff. pg. 5.  There is no evidence that this address came to the attention of the police independent of the traffic stop and there is no attenuation since the information was discovered while the traffic stop was in progress.  Moreover, the inevitable discovery exception is not applicable because there is no indication that the police would have later lawfully obtained Defendant Juarez's statement regarding that address.  *See United States v. Vasquez De Reyes*, 149 F.3d 192, 195-96 (3d Cir. 1998) (while considering application of inevitable discovery exception to statements, court observed that "a statement not yet made is, by its very nature, evanescent and ephemeral.  Should the conditions under

which it was made change, even but a little, there could be no assurance the statement would be the same"). *See also*, *United States v. Sanders*, 43 Fed. Appx. 249, 2002 WL 1644097 (10th Cir.2002) (Tenth Circuit "assumed, without deciding" that inevitable discovery doctrine did not apply to statements. In so assuming, Tenth Circuit cited *Vasquez De Reyes*, 149 F.3d at 195-196). Because Defendant Juarez's statement linking him to #15 CR4909 is fruit of the illegal traffic stop, it shall be suppressed.

Defendant Juarez also argues for the suppression of statements or evidence from the traffic stop that linked him to #14 CR4909. This specific address, #14 CR4909, never came to light during the traffic stop. However, the issue is, was the link made between Defendant Juarez and #14 CR4909 nonetheless the "fruit" of that traffic stop, even though it was not specifically referenced in that stop?

Prior to the traffic stop at issue, the police had absolutely no evidence that Defendant Juarez was connected to #14 CR4909 in the Harvest Gold Subdivision. At most, at the time of the stop all that the police knew was that Defendant Juarez,[7] in his brown Chevy Suburban, had been followed by police into the Harvest Gold Subdivision. However, as indicated by Agent Jamison's affidavit, "After getting into the Harvest Gold area the Agents were unable to follow the vehicle any further due to the lack of traffic in the area and the hour of the night." Jamison Aff. pg. 5. Therefore, prior to the arrest, police had not linked Defendant Juarez with any particular road, house, or address

---

[7]For purposes of clarity, I refer to Defendant Juarez here. However, it is important to note that the police had not linked the suspect they knew as "Miguel" to Defendant Juarez until after they obtained an identification from the CI pursuant to a photograph from the illegal traffic stop.

-13-

within the Harvest Gold Subdivision.[8]  It was not until the traffic stop, when Defendant Juarez

described his local address, that any link was established between Defendant Juarez and a particular

road and address within the subdivision; namely #15 CR4909.  Later, on the day of the traffic stop,

Agent Jamison and another Agent  drove past the address provided by Defendant Juarez and looked

for the brown Suburban that Defendant Juarez drove.  The vehicle in question was not observed at

#15 CR4909, however, while driving past that address, Agent Jamison glanced  over and saw

Defendant Juarez standing with the brown suburban underneath a small overhang located at #14

CR4909.  Clearly, the address obtained during the traffic stop is what directly led the police to #14

CR4909, thus establishing the necessary nexus between the traffic stop and the location.

Having established this nexus, the government must once again demonstrate that the evidence

at issue would have been inevitably discovered, was discovered through independent means, or was

so attenuated from the illegality as to dissipate the taint of the unlawful conduct.

Given that the police drove by #15 CR4909 and saw Defendant Juarez at #14 CR 4909 on

the very same day that as the illegal traffic stop, I find that there was insufficient attenuation to

dissipate the taint  of the stop.   Next I address whether there was independent means to link

Defendant Juarez to #14 CR4909.  The government has presented no evidence that they learned from

any other source information that would connect their investigation of Defendant Juarez's activities

with the #14 CR4909 or #15 CR4909 addresses.  The only way they became aware of #15 CR4909

was during the illegal stop.  They then used this information and drove by #15 CR4909, which

---

[8]While there is only one paved road through the Harvest Gold subdivision, Agent Jamison testified at the suppression hearing that there are also dirt roads that travel in and out of the subdivision.

resulted in observing Defendant Juarez at #14 CR4909.  This is how the police linked Defendant to #14 CR4909 and any argument that the address was found independent of the traffic stop must fail.

Finally, I consider whether the government has demonstrated that the evidence would have been inevitably discovered.  Prior to the illegal stop, the police did not know where Defendant Juarez resided.  Although they had observed him going into the Harvest Gold Subdivision, they were unsuccessful in determining where he went within the subdivision.  Tracking Defendant Juarez's location in the subdivision would have been particularly difficult because he was only there on an irregular basis.  At the suppression hearing, Defendant Juarez testified that he had only spent one night, the night before his arrest, at #14 CR4909, and he had only parked cars there for several days before that.

While the police did have some other information about the Harvest Gold Subdivision, it was not the specific information that they gained from the illegal stop.  For instance, on March 7, 2006, as Defendant Juarez was driving the brown colored Suburban, police followed him into the Harvest Gold Subdivision but then lost sight of the vehicle.  On another occasion Agent Jamison and Deputy Aeschlemann went and spot-lighted the Harvest Gold Subdivision, hoping to observe the brown Suburban that Defendant Juarez drove, but they did not find it.  Aside from these failed attempts, the only other information that may have linked Defendant Juarez and the Harvest Gold Subdivision came on March 8, 2006, when an officer relayed to Agent Jamison that an anonymous tip had been received.  The anonymous tipster advised that a man named Miguel, from Phoenix, had moved into Ishmael Cordova's house in Harvest Gold  on CR4909.  While no exact address was provided by the tipster, Agent Jamison, if he had relied on the tip alone, would have concluded that the tipster was

-15-

not referring to #14 CR4909, since Agent Jamison knew, at the time he received the tip, that Ishmael Cordova **did not reside** at #14 CR4909.

Given the sparse information that the police gathered separate from the illegal stop, I find that the #14 CR4909 address would not have been inevitably discovered.  Therefore, because the government has failed to prove that the evidence tying Defendant Juarez to #14 CR4909 is not the fruit of the illegal stop, this evidence shall be suppressed.

### (c)        In-Court Identifications of Defendant

"[A]n in-court identification could be valid . . .even if an earlier identification by the same witness relied on evidence illegally obtained through another arrest."  *United States v. Slater*, 692 F.2d 107, 108 (10th Cir. 1982) (citing *United States v. Crews*, 445 U.S. 463 (1980)).  Such an in-court identification may be permissible if it is "ensure[d] that the identification would be independent of tainted evidence previously seen."  *Id.*

The Supreme Court decision in *Crews* is on point in this matter.  In *Crews*, an individual was picked up by police on the pretext of being a suspected truant.  In fact, the reason the police detained him was because he seemed to match the description of a man who was linked to a series of robberies.  While detained, the police took a picture of defendant, which was then placed in a photographic array.  One of the robbery victims positively identified the defendant as her assailant. A similar identification was made by another victim.  A lineup was ordered and the defendant was positively identified by the two women who had made the photographic identifications.  The trial court suppressed the photographic and lineup identifications, but allowed an in-court identification on the premise that "the victims' ability to identify respondent in court was based upon independent recollection untainted by the intervening identifications . . . ."  *Crews*, 445 U.S. at 468.  The United

States Supreme Court, in analyzing the case, began with the premise that "the question before the court is whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the "taint" imposed upon that evidence by the original illegality."  *Id*. at 471.

First, the Court in *Crews* noted that the identifying victim's presence in the courtroom was not the fruit of misconduct.  Rather, the Court stated:

> [T]he robbery victim's presence in the courtroom at respondent's trial was surely not the product of any police misconduct.  She had notified the authorities immediately after the attack and had given them a full description of her assailant.  The very next day, she went to the police station to view photographs of possible suspects, and she voluntarily assisted the police in their investigation at all times.  Thus this is not a case in which the witness' identity was discovered or her cooperation secured only as a result of an unlawful search or arrest of the accused.  Here the victim's identity was known long before there was any official misconduct, and her presence in court is thus not traceable to any Fourth Amendment violation.

Likewise, in the present case, the CI's presence in the courtroom would not be attributable to the traffic stop because the CI's identity was known before there was any official misconduct.  And, obviously, Agent Jamison's or Deputy Aeschlemann's identity was not discovered or their cooperation secured only as a result of the illegal traffic stop.

However, the inquiry in *Crews* did not end there.  Next the *Crews* court determined that "the illegal arrest [did not] infect the victims' ability to give accurate identification testimony."  *Id*. at 472.  Specifically, the Court found that "the witnesses' courtroom identification rested on an independent recollection of her initial encounter with the assailant, uninfluenced by the pretrial identifications, and this determination finds ample support in the record."  *Id* at 473.  However, in so holding, the Court did admit that under some circumstances, "the intervening photographic lineup identification - both

-17-

of which are conceded to be suppressible fruits of the Fourth Amendment violation - could . . . affect

the reliability of the in-court identification and render it inadmissible as well." *Id* at 472.

In the case at hand, before the traffic stop, Agent Jamison and Deputy Aeschlemann did not

know Defendant Juarez's identity.  As for Deputy Aeschlemann, there is no evidence that he ever saw

Defendant Juarez independent of the illegal stop.  Nor is there any evidence that Agent Jamison ever

saw Defendant Juarez before the stop.  However, Agent Jamison did observe Defendant Juarez three

other times after the traffic stop.  The first two times occurred later in the day on March 8, 2006, the

date of the traffic stop.  One time was when Agent Jamison drove by #15 CR4909, the address

provided during the traffic stop, to see if he could place Defendant Juarez at that address.  At that

point, he saw Defendant Juarez across the street at #14 CR4909, standing in front of the brown

Suburban.  The other time, on that same date, was when the CI was engaging in a controlled purchase

at the Family Dollar parking lot.  Agent Jamison was in the parking lot and he observed, from about

fifty to seventy-five yards away, two males get of a Firebird.  At the suppression hearing he stated

that he recognized the passenger as the male that was stopped during the traffic stop.  The CI

approached the two men and the drug purchase occurred in front of the Firebird.  The third time

Agent Jamison observed Defendant Juarez was on the day of the arrest, when he saw him leaving La

Cabana restaurant.  Agent Jamison was parked across the street when he observed Defendant Juarez

leave the restaurant and get into his car.

In total, there were three occasions, aside from the traffic stop, when Agent Jamison observed

Defendant Juarez, once from a distance of half a football field away, once from across the street and

once during a drive by in the Harvest Gold Subdivision.  On each of these occasions his ability to

identify Defendant Juarez appears to have stemmed from the illegal traffic stop.  Because there is no

-18-

evidence before this Court that Agent Jamison would be able to rest an identification of Defendant on any recollection independent of the traffic stop, an in-court identification by Agent Jamison shall not be permitted.

In regard to the CI, a limited in-court identification shall be permitted. The CI had multiple occasions to observe and interact with Defendant Juarez, who she knew as "Miguel", during the course of the investigation. Therefore, she will be permitted to identify Defendant Juarez based on the information she had independent of the traffic stop. Specifically, she will be permitted, if able, to identify him as the person she knew as Miguel; however, she will not be permitted to identify him by his actual name - "Alfonzo Juarez" - since this connection was only made to pursuant to the traffic stop and the subsequent photograph.

        **(e)**      **evidence gained as a result of a search of the persons, vehicles and premises at #14 CR4909**

The evidence gained as a result of a search of the persons, vehicles and premises at #14 CR4909 was gained pursuant to a search warrant. That search warrant contained information that was tainted by the illegal traffic stop. As previously discussed, evidence linking Defendant Juarez to #15 CR4909 and #14 CR4909 must be suppressed because it is fruit of the illegal stop. The warrant affidavit relied on this tainted evidence to establish probable cause to search #14 CR4909 and its curtilage. However, simply because a warrant affidavit contains tainted evidence does not automatically invalidate the resulting warrant. Rather, "[a]n affidavit containing erroneous or unconstitutionally obtained information [only] invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir.

1990) (citing *United States v. Karo*, 468 U.S. 705, 719 (1984)).  As stated before, aside from the information obtained through the illegal traffic stop, the police had no reason to suspect that criminal activity was afoot at #14 CR4909.  Therefore, once the illegally obtained information regarding #14 CR4909 is excised from the warrant affidavit, there is insufficient untainted evidence to establish probable cause to search #14 CR4909.  Therefore, all information obtained as a result of the search of #14 CR4909 pursuant to the warrant shall be suppressed.[9]

## CONCLUSION

The traffic stop of Defendant Juarez on March 8, 2006, was in violation of his Fourth Amendment rights.  Because this stop was illegal, the photographs taken of Defendant Juarez during the stop; identification of him based on those photographs; statements or evidence linking him to #15 or #14 CR4909; and, any evidence gained as a result of the search of the persons, vehicles and premises at #14 CR4909 shall be suppressed as fruit of that illegal traffic stop. Moreover, any in-court identification of Defendant Juarez by Agent Jamison or Deputy Aeschlemann shall not be allowed.  However, a limited in-court identification by the CI shall be permitted.  Specifically, the CI will be permitted, if she is able, to identify Defendant Juarez as the person she knew as "Miguel"; however, she will not be permitted to identify him by his actual

---

[9]Defendant Juarez also argued that evidence obtained from the search warrant should be suppressed because the entire warrant affidavit, including information from the illegal stop, did not establish probable cause to justify issuance of a warrant and, therefore, the warrant was invalid.  I do not address that argument here because I find that the evidence shall be suppressed on other grounds; namely, it is suppressed because it is "fruit" of the illegal arrest, not because I made a finding that the search warrant was invalid.

name - "Alfonzo Juarez" - since this connection was only made to pursuant to the traffic stop and

the subsequent photograph.[10]

IT IS THEREFORE ORDERED that Defendant Juarez's motion is **GRANTED**.

Dated this 27th day of September, 2006.

_____
MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

Attorney for Plaintiff:
Damon Martinez

Attorneys for Defendants:
Joe Romero, Jr.
Phillip Medrano

---

[10]As previously indicated, Defendant Peraza asserted that he had joined this motion. However, even if this Court found that he had properly joined this motion, this Court would not suppress the evidence at issue on behalf of Defendant Peraza because he lacks standing to challenge said evidence. Defendant Peraza was not present during the illegal traffic stop on March 8, 2006, and he has failed to establish the requisite possessory or ownership interest in the residence and curtilage that was searched. The only exception to that is the white Chevy Malibu that was parked at #14 CR4909 and a separate search warrant was obtained before that vehicle was searched. That separate warrant for the vehicle was not challenged.