## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                     No.  CR-06-0762 MV

ALFONZO JUAREZ and
JORGE ALFONSO PERAZA,

       Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Peraza's Motion to Suppress **[Doc. No. 31]**, filed June 8, 2006.  The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that Defendant Peraza's motion is well taken and will be **GRANTED**.

### BACKGROUND

On March 10, 2006, Defendant Peraza was detained by police when the vehicle that he was traveling in was stopped.  Police stopped the vehicle so that the two other occupants of the vehicle, Defendant Juarez and Defendant Quintero, could be arrested pursuant to warrants based on suspicion of drug trafficking.[1]   Earlier that day, a Confidential Informant ("CI") arranged to meet Defendant Juarez at La Cabana Restaurant to purchase drugs.  That afternoon, the CI informed agents that the Defendants were on their way to La Cabana restaurant.  Soon thereafter, a brown Suburban, which was  believed to be driven by Defendant Juarez, was observed in the parking lot of La Cabana and three males were seen exiting the restaurant and leaving in the brown Suburban.  Soon after the brown Suburban left the restaurant parking lot, the vehicle was pulled over.  Police extracted

---

[1]Defendant Quintero and Defendant Juarez are co-defendants in this matter.  They also filed motions to suppress; however, Defendant Quintero subsequently entered a guilty plea.

Defendant Peraza from the vehicle, handcuffed him and took him to Farmington Holding Facility, along with the other two passengers. The officer who detained Defendant Peraza alleges that Defendant Peraza matched the description of a person thought to be a drug associate of the other two passengers.

Once at the holding facility, a photograph was taken of Defendant Peraza, which was then used for a photo lineup that was shown to the CI. The CI identified the person in the photograph as the "Bookkeeper," a person who was suspected of engaging in drug trafficking activity. An Arizona driver's license obtained during the detention identified Defendant Peraza as Alfonzo Peraza. While at the holding facility, drugs were found in Defendant Peraza's left shoe. Subsequently, Defendant Peraza was formally arrested.

## DISCUSSION

Defendant Peraza argues that his detention on March 10, 2006, constituted an arrest and that any evidence that arises from that arrest should be suppressed because there was no probable cause for his arrest.

## I.      Did the Detention of Defendant Peraza Constitute an Arrest?

The government tries to avoid the probable cause requirement by claiming that Defendant Peraza "was initially detained and then arrested pursuant to probable cause once his photograph was identified by the confidential informant" and that "When the three defendants were taken back to the Farmington Holding Facility, Defendant Peraza was treated differently from Defendant Juarez and Flaco because he was initially considered detained rather than arrested." Govt's Resp. 5, 10.

The Tenth Circuit has "identified three categories of police-citizen encounters: (1)

-2-

consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity [which are often referred to as *Terry* stops]; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause." *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996).

The government's argument is invalid as Defendant Peraza was clearly arrested by the time he was taken to the holding facility. By that time, police had stopped the vehicle that Defendant Peraza occupied, handcuffed him, and transported him to the Farmington Holding Facility. Defendant Peraza was detained for at least thirty to forty minutes before he was, as the government describes it, "formally arrested."

The Tenth Circuit has found that the use of handcuffs in a seizure will trigger the requirement of probable cause. *United States v. Melendez-Garcia*, 28 F.3d 1046 (1994). In *Melendez-Garcia*, police stopped a vehicle based on information obtained from a confidential informant that the vehicle would be used by two individuals to transport marijuana. Once the vehicle was stopped, the police trained their weapons on the vehicle and made the three occupants exit the car. The occupants were then handcuffed and frisked and placed in three separate vehicles.

The *Melendez-Garcia* court analyzed whether the stop at issue had escalated into an arrest. At the start of its analysis it recognized "that the use of firearms, handcuffs, and other forceful techniques does not necessarily transform a *Terry* detention into a full custodial arrest - for which probable cause is required - when the circumstances reasonably warrant such measures." *Id*. at 1052. However, the Tenth Circuit found that the use of handcuffs was not justified during the *Terry* stop

in that instance, even though the "stop was based on suspicion of trafficking drugs." *Id*. at 1052. The

Tenth Circuit reasoned:

> Drugs and guns and violence often go together, and thus this might be a factor tending to support an officer's claim of reasonableness. However, there was no evidence or testimony from the police that they had reason to believe these particular suspects had guns or were violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing the defendants during the *Terry* stop. In the absence of such evidence, the naked fact that drugs are suspected will not support a per se justification for use of guns and handcuffs in a *Terry* stop.

*Id*. at 1052-53.

In comparison, in *United States v. Merkley*, 988 F.2d 1062 (10th Cir. 1993), the Tenth Circuit

found that the use of handcuffs was justified pursuant to a *Terry* investigative stop of a vehicle, where

police officers were informed that defendant had threatened to kill someone and was acting violently,

and an officer observed defendant pounding his fists on the steering wheel. However, the Tenth

Circuit qualified this finding by stating that the display of firearms and use of handcuffs was only

justified in order "to freeze **temporarily** the situation in order to ensure their safety and that of the

public." *Id*. at 1064; *see also*, *United States v. Neff*, 300 F.3d 1217 (10th Cir. 2002) (use of

handcuffs justified during *Terry* investigative stop where police had reason to believe that Defendant

was carrying a dangerous weapon); *United States v. Shareef*, 100 F.3d 1491 (10th Cir. 1996) (police

justified, for safety reasons, in using handcuffs, displaying weapons and separating defendants from

vehicles where one of defendants was suspected of being armed and dangerous and the stop was at

night when the police could not see whether defendants had access to weapons.)

The present case is analogous to *Melendez-Garcia*. Here, the police stopped the vehicle at

issue because they had warrants to arrest two of the occupants on suspicion of drug trafficking

charges.  The police did not have a warrant to arrest Defendant Peraza.  There is no indication that the police in this case had information that the occupants of the vehicle would be armed or that they were acting in a violent manner.  As the Tenth Circuit instructed in *Melendez-Garcia*, "the naked fact that drugs are suspected will not support a per se justification for use of guns and handcuffs in a *Terry* stop."  *Melendez-Garcia*, 28 F.3d at 1053.  Therefore, there is no evidence before this Court that the police had reason to believe Defendant Peraza had guns or was violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing Defendant Peraza during his detention.  Since the use of handcuffs was not warranted under a mere "investigative detention", their use escalated Defendant's Peraza's detention into a full custodial arrest.

Moreover, even if the use of handcuffs were not sufficient to support a finding that the seizure of Defendant Peraza constituted a full custodial arrest, then the use of handcuffs in combination with his transfer to the Farmington Holding Facility would support such a finding.

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court recognized that being taken to the police station is an arrest in the most traditional sense of the word; specifically, the Court stated that "It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime-'arrests' in traditional terminology."  *Id*. at 16. The Supreme Court has often held that, absent consent, being taken to a police facility constitutes an arrest of an individual.  *See Kaupp v. Texas*, 538 U.S. 626 (2003) (Court stated that "involuntary transport to a police station for questioning is sufficiently like arrest to invoke the traditional rule that arrests may constitutionally be made only on probable cause"); *Dunaway v. New York*, 442 U.S. 200 (1979) (Court held that individual's Fourth Amendment rights were violated when he was taken to police station without probable cause, stating that "There can be little doubt that petitioner was

'seized' in the Fourth Amendment sense when he was taken involuntarily to the police station");
*Davis v. Mississippi*, 394 U.S. 721 (1969) (absent probable cause or consent, police violated individual's Fourth Amendment rights when he was driven to police headquarters, confined and fingerprinted).

Likewise, the Tenth Circuit has held that probable cause must exist when a defendant is taken to a police station and detained during an investigation. *United States v. Matthews*, 615 F.2d 1279 (1980). In *Matthews*, the defendant was stopped by military police on suspicion that the car he was driving was stolen. When defendant failed to produce proper registration for the vehicle, he was taken to the police station where he was questioned and the car was searched. Defendant was released from custody ten hours later, but was arrested later when a records check of the vehicle confirmed that it was stolen. Defendant moved to suppress all evidence obtained as a result of his initial seizure arguing, in part, that the police lacked probable cause to arrest him. The Tenth Circuit, on examination of the facts, found that when defendant was taken to the police station, he was effectively under arrest and that "In such circumstances of detention for custodial interrogation it is . . . clear that regardless of whether there was a technical arrest, probable cause the same as for an arrest had to exist." *Id.* at 1284.

Based on the above analysis I find that by the time Defendant Peraza was involuntarily taken to the police station he was already under arrest and probable cause was required.

**II.     Since the Detention of Defendant Peraza Did Constitute an Arrest, Did Probable Cause to Exist to Justify the Arrest?**

"[A]warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 151 (2004). The Supreme Court has stated that "A person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause . . . ." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (holding that police did not have authority to search all occupants of a public tavern even though the police had a search warrant for the premises of the tavern, where there was no reasonable belief that individual patrons were involved in any criminal activity or were armed or dangerous). Although mere propinquity to criminal activity will not support a finding of probable cause, the Supreme Court has approved a police officer's inference that a passenger in a vehicle "will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or evidence of their wrongdoing." *Maryland v. Pringle*, 540 U.S. 366, 373 (2003); *see also Wyoming v. Houghton*, 526 U.S. 295, 304-05 (1999) (Court held that police officers with probable cause to search a car may inspect passengers' belongings found in the car that are capable of concealing the object of the search).

In *Pringle*, an officer stopped a car, containing three occupants, for speeding at 3:16 in the morning. When the driver of the car opened the glove compartment to retrieve the vehicle registration, the officer saw a large amount of rolled-up money. Pursuant to a search of the car, officers found $763 in the glove compartment and several bags of cocaine behind an armrest in the back seat. The three occupants offered no information about ownership of the drugs and money, and the officer arrested all three. The Court noted that, although the officers had probable cause to

believe that a felony had been committed upon recovering the cocaine from the vehicle, the question remained whether they had probable cause to believe that defendant Pringle, an occupant of the car, committed that crime.   In addressing this question, the Court began from the premise that "the substance of all the definitions of probable cause is a reasonable ground for belief of guilt and that the belief of guilt must be particularized with respect to the person to be searched or seized." *Id*. at 371 (internal quotation marks and citations omitted).   Under the facts presented, the Supreme Court considered it "an entirely reasonable inference . . . that any or all of the car's occupants had knowledge of, and exercised dominion and control over, the cocaine." *Id*. at 366.

In *United States v. Di Re*, 332 U.S. 581, (1947), the Supreme Court reached the opposite conclusion and found that the arrest of an occupant of a vehicle in which evidence of a crime was found was not warranted.   In *Di Re*, an investigator was told by a Mr. Reed that he was to buy counterfeit gasoline ration coupons from a man named Mr. Buttitta at a predetermined location. Police trailed Mr. Buttitta's car until it parked at the appointed place.   Police approached the car and found Mr. Reed in the back  holding counterfeit coupons.   Mr. Buttitta was in the driver's seat and Defendant Di Re sat in the passenger seat.   Before the occupants were arrested, Mr. Reed told the police that he had obtained the counterfeit coupons from Mr. Buttitta.   All three occupants of the vehicle were then arrested.   The Supreme Court found that the arrest of Di Re was not warranted under these circumstances.   Specifically, the Court stated that:

> An inference of participation in conspiracy does not seem to be sustained by the facts peculiar to this case. The argument that one who accompanies a criminal to a crime rendezvous cannot be assumed to be a bystander, forceful enough in some circumstances, is farfetched when the meeting is not secretive or in a suspicious hide-out but in broad daylight, in plain sight of passersby, in a public street of a large city, and where the alleged substantive crime is one which does not necessarily involve any act visibly criminal.

-8-

*United States v. Di Re*, 332 U.S. 581, 592 (1947).  Essentially, the difference between *Di Re* and *Pringle* was that in *Di Re* it was not reasonable to infer that all the occupants of the vehicle knew of the criminal activity afoot.

In *United States v. Soto*, 375 F.3d 1219 (10th Cir. 2004), the Tenth Circuit examined the issue of probable cause in the context of an automobile setting.  In *Soto*, police had set up a drug purchase at a gas station with an individual named Joel Marquez and an undercover agent, Officer Lucero.  Mr. Marquez indicated that he would be driving a white Ford truck.  Prior to the meeting to conduct the deal, police set up a counter-surveillance of the gas station.  While conducting surveillance of the gas station parking lot, the police observed a blue truck enter the lot, circle it slowly and then leave.  Soon thereafter, a white truck entered the gas station lot, also circled the lot and then parked in a hotel lot adjacent to the gas station lot.  Subsequently, the blue truck returned to the gas station lot and parked about 100 yards from the white truck.  The occupants of the blue truck had an unobstructed view of the white truck; however, there was no indication that they were in communication with the white truck.  The occupants of the white truck did not leave the truck to conduct any business in the gas station.

Officer Lucero, the officer who was to meet Mr. Marquez, arrived at the gas station and approached the white truck in the hotel parking lot and began negotiating with Mr. Marquez and another person identified as Joel Lujan.  At some point, an employee of the hotel asked Officer Lucero and Mr. Marquez to leave the parking lot.  Mr. Lujan told Officer Lucero that they would follow him.  However, before pulling in behind Officer Lucero's vehicle, the white truck drove to the gas station parking lot, pulled alongside the blue truck and paused.  The blue truck then pulled out and followed the white truck, which then followed Officer Lucero's vehicle.  As the three vehicles

left the parking lot, the white truck was pulled over and Mr. Marquez and Mr. Lujan were arrested. A search of the white pickup truck did not yield any drugs.  After their arrest, the blue truck was apprehended approximately five miles from the gas station and the occupants of the blue truck were also arrested.

Defendant Soto, one of the occupants of the blue truck, moved to suppress the evidence obtained as a result of his arrest, asserting that there was no probable cause.  The Tenth Circuit agreed that "Defendant is correct that nearness to the place of the arrest of a co-conspirator or to the place of illegal activity is not sufficient to establish probable cause."  *Id*. at 1222 (internal quotation marks omitted).  However, it found that under the circumstances the government had established that "there [was] much more than simple proximity."  *Id*.  Specifically, the Tenth Circuit stated, "There was no apparent reason for the blue truck to circle the parking lot and later park there except to conduct counter-surveillance.  Neither Defendant nor [the other occupant of the truck] conducted any business at the gas station."  *Id*.  In addition, the Tenth Circuit stated:

> The connection between the occupants of the white and blue pickup trucks became obvious when they left the parking lot.  The white truck went considerably out of its way to drive from the hotel parking lot to the gas station to get the blue truck to follow it before returning to Officer Luceros' vehicle in the hotel lot.  The close proximity of the two trucks as they drove through the lot emphasized that they were engaged in a common enterprise.  Because the white truck's occupants were known to have come to the gas station solely to deal cocaine, the blue truck's occupants were thus linked to criminal activity.  In addition, Lujan told Officer Lucero that the cocaine was nearby and suggested the they go to Officer Lucero's house to complete the deal; from these statements, one could infer that the drugs were in a vehicle in the vicinity.

*Id*. at 1222-23.  Under those circumstances, the Tenth Circuit found that there was probable cause to arrest Defendant Soto.

-10-

In an unpublished decision, *Kilgore v. City of Stroud*, 158 Fed.Appx. 944 (10th Cir. 2005), the Tenth Circuit addressed the precise question of whether probable cause existed to arrest the passenger of a vehicle involved in a drug transaction.  In *Kilgore*, Mr. Lewis, the driver of the vehicle at issue, was suspected of manufacturing methamphetamine from pseudoephedrine purchased at a particular drugstore.  On receiving a phone call that Mr. Lewis had just purchased a large amount of pseudoephedrine from the drugstore, the police pulled over the truck being driven by Mr. Lewis.  Mr. Lewis and Mr. Kilgore, the passenger of the truck, were arrested.  The Tenth Circuit held that under the circumstances there was probable cause to arrest Mr. Kilgore, even though he was not the one suspected of manufacturing methamphetamine.  The Tenth Circuit's holding was based on findings that Mr. Kilgore was more than a mere passenger in the vehicle; specifically, the Tenth Circuit found:

> The officers had information that Mr. Lewis was involved in the manufacture of methamphetamine, they had watched Mr. Lewis exit the convenience store with a plastic bag that the manager had informed them by phone contained a large quantity of pseudoephedrine, Mr. Lewis had attempted to escape when he saw the officers pull up, the officers had found a case containing a large quantity of syringes and needles, including one used needle and syringe, on the floor board of the front passenger seat where Mr. Kilgore was seated, and the bag with the eleven boxes of decongestant tablets was found in the middle of the back seat within Mr. Kilgore's reach.

*Id*. at 952 (internal quotation marks omitted).  Obviously, the Tenth Circuit gave weight to the fact that the illegal activity at issue was clearly visible to the occupant of the car.

In the present case, it is undisputed that on the day of the Defendant Peraza's arrest the CI had arranged to meet Defendant Juarez at La Cabana restaurant to purchase drugs.  At 3:25 on March 10, 2006, a Friday afternoon, the CI informed agents that the Defendants were on their way to La Cabana Restaurant.  Agent Jamison's narrative indicates that at approximately 3:30 p.m. he saw in the parking lot of La Cabana a brown Suburban that he believed to be driven by Defendant Juarez.

At approximately 3:33 Agent Jamison "observed three male subjects leave the restaurant." Jamison Narrative ¶ 1. Agent Jamison "identified the driver of the brown Suburban as Alfonzo Juarez ('Miguel'), the rear male passenger matched the description of a subject known as 'Flaco', and the other male passenger allegedly matched the description of their associate known as the 'Bookkeeper'." *Id*. Police pulled the brown Suburban over soon after it left the restaurant and all three men were placed in custody.

> In his narrative, Agent Jamison stated:
>
> Farmington Police Officers placed Alfonzo Juarez and Defendant Quintero under arrest for the warrants Judge Birdsall issued. The subject known as the 'Bookkeeper' was detained until I could get him identified by the Confidential Informant used in this case. Since we did not know who the 'Bookkeeper' was on sight, and did not have any idea who he was, or where he came from Sgt. Anderson advised that there was enough exigency to arrest the "Bookkeeper" (after he was identified) . . . ."

*Id*.

There is no evidence before this Court that any drugs, drug paraphernalia, large sums of money, etc. were found in the brown Suburban. However, when the three Defendants were searched at the holding facility, drugs were found on their persons. Specifically, field testing revealed 2.7 grams of methamphetamine in Defendant Quintero's shoe, a small baggie with a white powdery residue was found in Defendant Juarez's jacket (the amount of residue was insufficient to test), and approximately 1 gram (including packaging) of cocaine was found in Defendant Peraza's shoe.

As previously discussed, Defendant Peraza's mere propinquity to people suspected of trafficking drugs was not enough to establish probable cause for his arrest. So the issue before this Court is, whether there something more than mere propinquity to establish probable cause for the arrest of Defendant Peraza. Unlike the facts in *Pringle* and *Kilgore*, there were no large sums of

money, drug paraphernalia or drugs in the car, which would have led the arresting officers to believe that Defendant Peraza had knowledge of, and exercised dominion and control over the drugs allegedly being trafficked.  While drugs were found on Defendants' persons at the holding facility, this was after the fact of the arrest had already occurred.

In fact, Defendant Peraza's situation is more akin to the defendant's situation in *Di Re*, where at the time of arrest there was no visible evidence of criminal activity in the vehicle that may have been used to impute Defendant Peraza with knowledge that criminal activity may have been afoot.

Also, Defendant Peraza's situation is different from the situation in *Soto*, where there seemed to be no legitimate basis for defendants' presence at the scene of the crime.  Here, Defendant Peraza and the two other defendants were observed leaving La Cabana Restaurant.  Defendant Peraza may very well have been present at La Cabana for a legitimate reason, such as obtaining a meal with friends.  They were there during regular business hours.  While the narrative does suggest that they were only in the restaurant for a short period of time (the CI informed agent that Defendants were on their way to La Cabana at 3:25 pm, a brown Suburban was observed at La Cabana at approximately 3:30 p.m. and Defendants seen leaving La Cabana at approximately 3:33 p.m.), La Cabana does offer takeout, and legitimate business may have been conducted there in a matter of minutes.

Of course, in this situation, there is some indication that Defendant Peraza matched the description of an associate known as the "Bookkeeper."  However, reliance on this information for establishing probable cause is problematic.

First of all, the narrative provided by Agent Jamison indicates that identification of Defendant Peraza as potentially being the "Bookkeeper" did not justify the arrest of Defendant Peraza.

-13-

Specifically, in his narrative, Agent Jamison states "Since we did not know who the 'Bookkeeper' was on sight, and did not have any idea who he was, or where he came from Sgt Anderson advised that there was enough exigency to arrest the 'Bookkeeper' **after he was identified**."   Jamison Narrative ¶ 1.  Because of this complete lack of information it appears that Agent Jamison understood from Sgt. Anderson that they would need to get identification of Defendant Peraza as the Bookkeeper before they could make an arrest.  This understanding is consistent with Agent Jamison's assertion that Defendant Peraza was only "detained" until he was identified by the CI.  *Id*.  The government, in their response supports this conclusion when they explain that "When the three defendants were taken back to the Farmington Holding Facility, Defendant Peraza was treated differently from Defendant Juarez and Flaco because he was initially considered detained rather than arrested." Govt's Resp. 5.  The government states that Defendant Peraza was not "formally arrested" until the CI identified him from a photographic array.  Unfortunately for the government, the fact is that Defendant was arrested well before he was identified.  Probable cause must be established before the arrest, not after the fact.  *See Rio v. United States*, 364 U.S. 253 (1960).

The government in their response, addresses the probable cause issue from another angle and focuses on Agent Jamison's narrative statement where he says "the other male passenger matched the description of their associate known as the 'bookkeeper'."  Jamison Narrative ¶ 1.  Essentially, the government argues that because Defendant Peraza matched the description of an associate called the "Bookkeeper" there was probable cause for his arrest.  The government summarizes the basis of the probable cause into five categories.  I address each category below:

-14-

1)      **law enforcement knew that a drug crime had taken place on March 7th and March 8th**

This factor, standing on its own, does not draw any connection between the alleged conduct on March 7th and 8th and Defendant Peraza.

2)      **the drug crime involved an individual known as the "bookkeeper"**

According to the government's response, the "Bookkeeper" was only present for the deal that occurred on March 7th and not the deal that occurred on March 8th.  The CI met with the person that she called the "bookkeeper" and another individual on March 7th. Although the CI did reference a person that she called the "Bookkeeper" in relation to the drug trafficking activity, there is no evidence that the CI ever identified the "Bookkeeper" as Jorge Peraza.  While the government's response states that "The bookkeeper has been identified as Defendant Jorge Alfonso Peraza,"  there is no indication that the name "Bookkeeper" was ever linked to the name Jorge Peraza until after the arrest.  *See Wong v. Sun*, 371 U.S. 471 (1963) (Court found there was no probable cause to arrest where there was no indication that the agents had information giving them reason to equate the name supplied by the informant, "Blackie Toy", with the name of the individual arrested, "James Wah Toy").

3)      **law enforcement had a description of the "Bookkeeper" and Defendant Peraza fit the description of the "Bookkeeper."**

The government characterized the description obtained from the CI as follows:  Hispanic male, short, overweight, short hair and clean shaven.  Here, Defendant Peraza correctly notes that "This description is so vague that it could easily describe many men in Farmington where Mr. Peraza was arrested."  Defendant Peraza's Reply 2.  Defendant Peraza also points out that, in fact, he is 5'9", which places him above the 85th percentile for Hispanic men.  However, even assuming that

-15-

Defendant Peraza, at 5'9", could be considered short, the description provided by the CI was so vague that it did not suffice to establish probable cause to arrest Defendant Peraza. *See Wong Sun v. United States*, 371 U.S. 471 (1963).

In *Wong Sun*, federal agents received a tip that someone named 'Blackie Toy,' a proprietor of a laundry on Leavenworth Street, was trafficking in heroin. Federal agents went to a laundry at 1733 Leavenworth Street called "Oye's Laundry", which was operated by petitioner James Wah Toy. The agents rang the bell at Oye's Laundry and petitioner Toy answered the door. The agents stated that they were there on dry cleaning business and petitioner Toy told them to return when the business was open at 8:00 a.m. Petitioner Toy then tried to close the door but was stopped when one of the agents took out his badge and identified himself as law enforcement. At that point, petitioner Toy slammed the door and ran through the laundry to the back living quarters. The agents broke open the door and followed Petitioner Toy. Once apprehended, Toy reached into a nightstand drawer, at which point he was arrested at gunpoint. A subsequent search of the premises revealed nothing incriminating. The Supreme Court found that, under these circumstances, there was no probable cause to arrest Defendant. Particularly, the Supreme Court noted that there was "nothing in the record which identifies James Wah Toy and 'Blackie Toy' as the same person."

Likewise in this case, there is nothing in the record to identify Defendant Peraza as the same person as the "bookkeeper" except for a vague description, which would match much of the general population in Farmington.

In another case, *Whiteley v. Warden*, 401 U.S. 560 (1971), the Supreme Court again found that information that included a general description of the suspects was insufficient to establish probable cause. In *Whiteley*, at the time of arrest, the police had information about individuals

suspected of recently breaking and entering into certain business establishments.  Specifically, the police had information from a police bulletin that included a description of the two suspects.  The first suspect was believed to be named Jack Daley, age 38, approximately 175 pounds, 5'10" tall, medium build, blonde hair, blue eyes and a tatoo that said "Love Me or Leave Me."  *Id*. at 564.  The second suspect was named Harold Whitley, age 43, 180 pounds, 5'11", medium build, fair complexion, brown eyes and had tatoo on his right arm - "Bird."  *Id*.  The bulletin also provided that the two suspects might be driving a "1953 or 1954 Buick, light green bottom, dark top with a Wyoming license plate."  *Id*.

The arresting officers observed two men driving a car that matched the car described in the police bulletin.   In addition, one of the arresting officers knew that one of the individuals was "Jack Daley".  Finally, the officers observed that the other individual in the car matched the description of the second suspect.  When stopped, the second suspect, later identified as Mr. Whitely, gave a false name.

In examining the circumstances leading to the arrest, the Court stated that "where the initial impetus is an informer's tip, information gathered by the arresting officers can be used to sustain a finding of probable cause for an arrest that could not adequately be supported by the tip alone."  *Id*. at 567. The Court went on to find that "In the present case, the very most the additional information tended to establish is that either [the police officer], or his informant, or both of them, knew Daley and Whiteley and the kind of car they drove; the record is devoid of any information at any stage of the proceeding from the time of the burglary to the event of the arrest and search that would support either the reliability of the informant or the informant's conclusion that these men were connected with the crime."  *Id*.

Likewise in this case, at the time the police arrested Defendant Peraza, they knew from personal observation that Defendant met the very vague description of someone known as the "bookkeeper" and that the "bookkeeper" was someone identified by the CI as an individual who was engaging in drug trafficking activity.  However, just like the situation in *Whiteley*, from the time that the CI allegedly saw the bookkeeper engaging in illegal activity to the time of Defendant's arrest, the agents had no further information that would connect Defendant Peraza with the crime of drug trafficking.

In comparison, in *United States v. Miller*, 532 F.2d 1335 (10th Cir. 1976), the Tenth Circuit upheld a finding of probable cause that was based on a general description.  In *Miller*, law enforcement were searching for individuals suspected of robbing a bank earlier that morning.  Police bulletins were issued that gave physical descriptions of the suspects, the route they were traveling, as well as descriptions of the car, including its license plate number.  Police officers saw a car that matched the description, including license plate number, on the highway that the suspects were believed to be traveling on.  One of the individuals in the car matched, at least in part, the description broadcast over the police bulletin.  The police officers arrested the car's occupants.

The Tenth Circuit found that under these circumstances there was probable cause to make the arrest.  However, in so finding, the Tenth Circuit made a point of stating "It is important to realize that the arrests were made as the men were fleeing from the scene of an armed robbery and thus there were present exigencies calling for action." *Id*. at 1338.  The Tenth Circuit went on to state that "The cases hold that a general description of either the getaway car or the suspects is a sufficient basis for the existence of probable cause." *Id*.  In support of that statement, the Tenth Circuit cited numerous cases from different circuits.  Essentially all of the cases cited by the Tenth Circuit involved a stop

-18-

of a getaway car.  *See United States v. Maryland*, 479 F.2d 566 (5th Cir. 1973) (Police were looking

for "a group of four Negroes, two men and two women, who were travelling in a 'black and white

vinyl over green Cadillac'."   The Fifth Circuit held that there was probable cause to arrest individuals

matching that description and driving in that distinctive vehicle, where the arrest occurred only a short

time after the crime had occurred); *Keeny v. Swenson*, 458 F.2d 680 (8th Cir. 1972) (Eighth Circuit

found probable cause had been established where police pulled over and arrested individuals whose

car matched description of robber's getaway vehicle, where car was found approximately eight and

one-quarter miles from scene of crime); *United States v. Breedlove*, 444 F.2d 422 (5th Cir. 1971)

(Probable cause established where police broadcast provided description of getaway car and

described two robbery suspects as being "three Negro males accompanied by two females, one

possibly white," dressed in coveralls and ski masks and police pulled over vehicle at a time and

distance from check point which was consistent with the suspected travel of the gateway car); *United*

*States v. Ayers*, 426 F.2d 524 (2d Cir. 1970); (Police bulletin gave description, including license

number of getaway car.   Probable cause found to arrest defendant who was driving a similar

automobile with same license number, though automobile was not same make as that stated in radio

massage); *Coleman v. United States*, 420 F.2d 616 (D.C. Cir. 1969) (Finding of probable cause

upheld where police officers, approximately twenty minutes after bank robbery, pulled over and

arrested individuals who the descriptions of the suspects and were traveling in a vehicle that fit the

description of the getaway car along a logical escape route).[2]

---

[2]The other case cited by the Tenth Circuit, *LaBelle v. LaVallee*, 517 F.2d 750 (2d Cir. 1975),
did not involved a getaway scenario.   In that case, an individual was arrested for an assault crime.
One of the victims of assault had provided police with "descriptions of her assailants and a description
of the car in which they were riding. [Her] description of the car included the license number, found
to belong to a car registered to petitioner."   There is nothing in the *LaBelle* opinion to suggest that

In a more recent  unpublished decision, *United States v. Young*, 986 F.2d 1431, 1992 WL 401580 (10th Cir. 1992), the Tenth Circuit applied the same rationale as that applied in *Miller* and again upheld a finding of probable cause that was based on a general description. *Young*, like *Miller*, involved the arrest of a man fleeing from the scene of a crime, specifically, a bank robbery.  A police dispatch described the suspect as "a clean-shaven black male, medium build, approximately 5'9" to 5'11" with long, shoulder-length, black hair which was slicked back."  *Id*. at *1.  Within fifteen minutes, Mr. Young, who matched the description, was picked up approximately 2,500 feet from the bank.  The Tenth Circuit noted that "In addition, the officers observed Mr. Young's abrupt change in direction.  At the very least, given these factors, there was reasonable suspicion to stop and investigate Mr. Young.  From that vantage point, officers gathered additional clues which supported probable cause to arrest Mr. Young.  Mr. Young was visibly shaking and moved his arm in an aggressive manner during the frisk."  *Id*. at *2.  The Tenth Circuit concluded that "These facts, in addition to the factors which led to the initial stop, constitute probable cause for arrest."  *Id*.

Unlike *Miller* or *Young*, or the cases cited in *Miller* and *Young* for the premise that probable cause may be supported by a general description, the arrest in the present case was not made as the men were fleeing from the scene of a crime and thus presenting exigencies calling for action.  Rather, in the present case, the police had been building a case against the Defendants over a period of time.  They had arrest warrants for two of the individual Defendants in the car and had orchestrated a drug transaction specifically to execute the arrest warrants.  The orchestrated drug transaction never occurred and there was no indication that the suspects were fleeing a crime scene.  Given these facts

the description of the suspect was as vague as the description relied on for the arrest of Defendant Peraza.  Therefore, the *LaBelle* case is not instructive for the case at hand.

and the extremely vague description at issue, I find that there was no probable cause to make an arrest based on the vague description of the "bookkeeper" that was provided by the CI.

     4)    **the "Bookkeeper" kept company with Defendant Juarez and/or Flaco**.

As previously discussed, mere propinquity to those engaged in criminal activity does not support a finding of probable cause.

     5)    **At the time of the arrest, law enforcement knew that Defendant Juarez was waiting to conduct a drug deal with the CI**.

At the time of the arrest there was no factors that would have imputed Defendant Peraza with an awareness that illegal activity may have been afoot.  When he was apprehended he had just left a takeout restaurant, where he could have easily been engaged in legitimate business.  *Compare with United States v. Soto*, 375 F.3d 1219 (10th Cir. 2004) (discussed *supra*).  At the time of the arrest there was nothing visible in the vehicle that would have imputed knowledge of the drug transaction to Defendant Peraza.  *See United States v. Di Re*, 332 U.S. 581, 592 (1947) (discussed *supra*); *compare with Maryland v. Pringle*, 540 U.S. 366, 373 (2003) (discussed *supra*).  The agents had set up the meeting to buy drugs with Defendant Juarez, there is no evidence that the agents had intended or tried to set up a meeting that included Defendant Peraza.

    The Tenth Circuit has stated that "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Pringle*, 540 U.S. at 371.

The above individual factors standing alone do not establish probable cause.  Moreover, "connecting these facts does not add to their probative value" and thus do not support a finding of

probable cause.  *See United States v. Diltz*, 622 F.2d 476 (10th Cir. 1980) (Tenth Circuit held that

probable cause was not established given that "In this variety of conclusory facts, no single one is

sufficient to provide an agent with anything more than suspicion. Connecting these facts does not add

to their probative value).  Therefore, I find that at the time of Defendant Peraza's arrest, there was

no probable cause to make the arrest.

**III.     Since the Arrest of Defendant Lacked Probable Cause and, Therefore, Was
          Unlawful, What Evidence Against Defendant, If Any, Should Be Suppressed?**

Defendant Peraza asserts that any evidence discovered as a result of the allegedly illegal arrest

should be suppressed.  Defendant Peraza specifically challenges two categories of evidence:

identification of Defendant Peraza from a photo-lineup and any in court identification of Defendant

Peraza by the CI.

**A.     Identification of Defendant Peraza by the Confidential Informant Based on the Photo-
        Lineup**

Defendant Peraza contends that any identification of him by the CI that is based on his

photograph taken at the time of the arrest should be suppressed.

The photograph that the CI used to identify Defendant Peraza was obtained while he was at

the Farmington Holding Facility.  The Tenth Circuit has recognized that "Certain routine

administrative procedures, such as fingerprinting, photographing, and getting a proper name and

address from the defendant, are incidental events accompanying an arrest that are necessary for

orderly law enforcement and protection of individual rights."  *United States v. Olivares-Rangel*, 458

F.3d 1104, 1113 (10th Cir. 2006).  Moreover, the Tenth Circuit has held that "In light of the

underlying purpose of the exclusionary rule, it would make little sense to suppress such evidence

obtained merely as part of a routine booking procedure, even where a judge subsequently rules that

the arrest was illegal." *Id*.   However, the Tenth Circuit also recognized that such evidence may be properly suppressed where an "unconstitutional arrest was purposefully exploited in order to develop critical evidence of criminal conduct to be used against Defendant." *Id*.

In this case, Defendant Peraza was illegally detained by police in order to develop evidence that would link him to the ongoing drug trafficking investigation.  Specifically, Agent Jamison, in his narrative, states that "The subject known as the 'Bookkeeper' was detained until I could get him identified by the Confidential Informant used in this case."  Jamison Narrative ¶ 1.  Under these circumstances, the routine booking procedure exception to the exclusionary rule, as carved out by the *Olivares-Rangel* court, is not applicable in this case.

Therefore, I engage in the standard suppression analysis, which requires that in order "[t]o suppress evidence as the fruit of his unlawful detention, [Defendant] must make two showings: (1) that the detention did violate his Fourth Amendment rights; and (2) that there is a factual nexus between the illegality and the challenged evidence." *DeLuca*, 269 F.3d at 1132.  In order to establish a factual nexus, the Defendants must "at a minimum, . . . adduce evidence . . . showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."[3]  *Id*.

---

[3]This "but for" question is a more general question than that later reached when determining whether evidence is "fruit of the poisonous tree."  Specifically, "Beyond the 'but for' test, the ultimate 'fruit of the poisonous tree' inquiry asks whether the challenged evidence has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 n.1 (10th Cir. 2000).  In other words, even if Defendant meets his initial burden and shows that the evidence would not have come to light but for the illegal conduct, it still may not be considered fruit of the poisonous tree if it has been purged of the primary taint.

Once Defendant makes this showing, the burden then shifts to the government to prove that the evidence that Defendant seeks to suppress is not "fruit of the poisonous tree."  The government can meet this burden "either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct."  *Id.*

Obviously, but for this detention, the photograph would not have been taken.  Likewise, any identification based on these photographs would have a nexus to the detention.  The government cannot claim that these photographs were obtained by independent means.  Neither can they claim attenuation - the photographs were taken while the detention at issue was still in progress.  That leaves the claim of inevitable discovery.  "Under the inevitable discovery exception, unlawfully seized evidence is admissible if there is no doubt that the police would have lawfully discovered the evidence later."  *United States v. Romero*, 692 F.2d 699, 704 (10th Cir. 1982).  Specifically, this means "whether that very item of evidence would inevitably have been discovered, not merely whether evidence roughly comparable would have been so discovered."  W. LaFave, Search and Seizure § 11.4(a), p. 268 (4th ed. 2004).  Certainly, but for the illegal traffic stop, the particular photograph at issue would never have been discovered.

For the reasons stated above I find that it is proper to suppress the photograph taken during Defendant Peraza's arrest and to suppress any identification of him based on that photograph.  Moreover, as a matter of policy it makes sense to suppress such evidence.  As Judge Kimball in *United States v. Beckwith*, 22 F.Supp. 2d 1270 (D. Ut. 1998) succinctly articulated :

> If the courts were to sanction the practice of making illegal arrests for the specific purpose of collecting photographs to be used in future or ongoing investigations we would encourage an increase, perhaps dramatic, in the frequency of unconstitutional

conduct on the part of law enforcement. In those instances, the taking of the photographs supplies an important motive, perhaps the prime motive, for the illegal arrests. Accordingly, to protect constitutional rights, the underlying purpose of the exclusionary rule would dictate the courts bar the photographs and resulting identifications.

*Id.* at 1294 (citing W. LaFave, Search and Seizure § 11.4(g), p. 322 (3d ed. 1996)). In this case, Defendant Peraza was arrested specifically for the purpose of having him identified. To allow the government to use this identification evidence at trial would only sanction this practice of making illegal arrests for this purpose.

    B.    Under_In-court Identification of Defendant Peraza by Confidential Informant

        "[A]n in-court identification could be valid . . .even if an earlier identification by the same witness relied on evidence illegally obtained through another arrest." *United States v. Slater*, 692 F.2d 107, 108 (10th Cir. 1982) (citing *United States v. Crews*, 445 U.S. 463 (1980)). Such an in-court identification may be permissible if it is "ensure[d] that the identification would be independent of tainted evidence previously seen." *Id.*

    The Supreme Court decision in *Crews* is on point in this matter. In *Crews*, an individual was picked up by police on the pretext of being a suspected truant. In fact, the reason the police detained him was because he seemed to match the description of a man who was linked to a series of robberies. While detained, the police took a picture of defendant, which was then placed in a photographic array. One of the robbery victims positively identified the defendant as her assailant. A similar identification was made by another victim. A lineup was ordered and the defendant was positively identified by the two women who had made the photographic identifications. The trial court suppressed the photographic and lineup identifications, but allowed an in-court identification on the premise that "the victims' ability to identify respondent in court was based upon independent

recollection untainted by the intervening identifications . . . ."  *Crews*, 445 U.S. at 468.  The United

States Supreme Court, in analyzing the case, began with the premise that "the question before the

court is whether the chain of causation proceeding from the unlawful conduct has become so

attenuated or has been interrupted by some intervening circumstance so as to remove the "taint"

imposed upon that evidence by the original illegality."  *Id*. at 471.

First, the Court in *Crews* noted that the identifying victim's presence in the courtroom was

not the fruit of misconduct.  Rather, the Court stated:

> [T]he robbery victim's presence in the courtroom at respondent's trial was surely not
> the product of any police misconduct.  She had notified the authorities immediately
> after the attack and had given them a full description of her assailant.  The very next
> day, she went to the police station to view photographs of possible suspects, and she
> voluntarily assisted the police in their investigation at all times.  Thus this is not a case
> in which the witness' identity was discovered or her cooperation secured only as a
> result of an unlawful search or arrest of the accused.  Here the victim's identity was
> known long before there was any official misconduct, and her presence in court is thus
> not traceable to any Fourth Amendment violation.

*Id*. at 472.  Likewise, in the present case, the CI's presence in the courtroom would not be

attributable to the traffic stop because the CI's identity was known before there was any official

misconduct.

However, the inquiry in *Crews* did not end there.  Next the *Crews* court determined that "the

illegal arrest [did not] infect the victims' ability to give accurate identification testimony."  *Id*. at 472.

Specifically, the Court found that "the witnesses' courtroom identification rested on an independent

recollection of her initial encounter with the assailant, uninfluenced by the pretrial identifications, and

this determination finds ample support in the record."  *Id* at 473.  However, in so holding, the Court

did admit that under some circumstances, "the intervening photographic lineup identification - both

of which are conceded to be suppressible fruits of the Fourth Amendment violation - could . . . affect the reliability of the in-court identification and render it inadmissible as well." *Id* at 472.

In the present case, a limited in-court identification shall be permitted. The CI had multiple occasions to observe and interact with Defendant Peraza, who she knew as the "Bookkeeper", during the course of the investigation. Therefore, she will be permitted to identify Defendant Peraza based on the information she had independent of the line-up that was based on the tainted photograph evidence. Specifically, she will be permitted, if able, to identify him as the person she knew as the "Bookkeeper"; however, she will not be permitted to identify him by his actual name - "Jorge Peraza" - since this connection was only made to pursuant to his arrest and the subsequent photo line-up.

## CONCLUSION

When Defendant Peraza was stopped, handcuffed and taken to the Farmington Holding Facility, he was arrested in violation of his Fourth Amendment rights. Because this arrest was illegal, the photographs taken of Defendant Peraza during his arrest and any identification of him based on those photographs shall be suppressed. Moreover, only a limited in-court identification by the CI shall be permitted.

IT IS THEREFORE ORDERED that Defendant Peraza's motion is **GRANTED**.

Dated this 29th day of September, 2006.

_____

MARTHA VÁZQUEZ
U. S. DISTRICT COURT JUDGE

Attorney for Plaintiff:
Damon Martinez

Attorneys for Defendants:
Joe Romero, Jr.
Phillip Medrano